UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


Michael S. Kimm, Esq.  (MK4476)
Adam Garcia, Esq.
KIMM LAW FIRM
333 Sylvan Avenue, Suite 106
Englewood Cliffs, New Jersey 07632
T: 201-569-2880
*Attorneys for Plaintiffs*

| | |
|---|---|
| 470 WEST 42 STREET GOURMET, INC. DBA TREEHAUS MIMA,<br><br>                Plaintiffs,<br>   vs.<br><br>KJY INVESTMENT LLC and YOUNG MAN KIM,<br><br>                Defendants. | Civil Action<br><br>17-CV-_____<br><br><br>**Complaint with Jury Demand** |

Plaintiffs, by their attorneys, for their complaint against the defendants, allege as follows:

## NATURE OF ACTION

1.  A commercial lender of a two-year supplemental construction loan has been asserting a "shareholder right" in the borrower's business and, in the alleged exercise of alleged shareholder rights, has been actively interfering with the conduct of the day to day business.  The lender has been coercing the borrower to sue the borrower's

landlord despite the fact that the borrower has a good relationship with the landlord. The lender has been coercing the borrower to sue another lender, with a superior lien position as against the lender to cause the first lien position to be waived or negotiated down.  The lender has been interfering with the day to day conduct of the business at the store location, attempting to direct employees as to how to conduct themselves and "instructing" plaintiff as to where to position products, and routinely threatening that the lender could easily "wipe out" plaintiff's interest in the business.

2.  This is an action for a declaratory judgment, permanent injunction, fraud-in-the inducement, breach of contract, breach of the covenant of good faith and fair dealing, tortious interference and promissory estoppel in which a commercial lender has acted in bad faith, arbitrarily and capriciously, and contrary to its own antecedent representations with their borrower and with the intent or bad faith of interfering with the borrower/plaintiff's conduct of business so as to discharge the debts in good faith, as part of the lender's scheme to take unlawful and tortious control over the borrower's newly-established business.

## THE PARTIES

3. At all relevant times, plaintiff 470 West 42 Street Gourmet, Inc., DBA Treehaus Mima was and is a legal entity organized under New York State laws and has its principal place of business at 470 West 42nd Street, Manhattan.

4. At all relevant times, defendant KJY Investment LLC is a New Jersey business entity having an address at 440 Sylvan Avenue, Englewood Cliffs, NJ 07632 and operates a commercial lending business that operates in New York among other places.

5. At all relevant times, defendant Young Man Kim is an individual believed to be residing at 21 Mohegan Trail, Saddle River, NJ 07458.

## JURISDICTION AND VENUE

6. This court has jurisdiction over this action as the parties are citizens or entities of different states and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

7. Venue is proper in this district because substantial events occurred in this district.

## BACKGROUND

8. In October 2013, Michael Park was a young business man who operated multiple "mega deli/café" businesses in New York City.  Park invested a significant sum of money, his sweat and his efforts to establishing 470 West 42 Street Gourmet, Inc., DBA Treehaus Mima.  With significant development and new construction of numerous apartments, condominium buildings, and officer towers in midtown, particularly near the Theater District, Park perceived a need and suitability for a

specialty supermarket at West 42nd Street near the Hudson River waterfront, where,

previously no such business existed.

## A. <u>The Lease is Signed</u>

9. On October 23, 2013, the store lease between plaintiff 470 West 42 Street

Gourmet Food, Inc., as tenant, and 42nd and 10th Associates, LLC, as landlord, was

duly signed, for a 15 year term and rent payments of approximately $1 million for the

first year with increases of the successive years, totaling approximately $20 million.

The main Lease text runs 68 pages of extensive details with another 20 pages of

addenda including Rules and Regulations, floor plans, landlord's work, guaranty, and

lower level space configuration attachments.

10.  A central provision in the Lease, implicating the landlord's contribution

of up to a million dollars of "matching tenant credits," related to construction

improvements to the building, payable to the tenant.  Section 3.5 of the Lease, in

relevant part, states as follows:

> Section 3.5. (A) Subject to the provisions of this Section 3.5,
> Landlord shall contribute an amount not to exceed One Million Dollars
> ($1,000,000.00) (the "Tenant Fund") toward the cost incurred by Tenant
> in preparing the Premises for Tenant's initial occupancy. No portion of
> the Tenant Fund shall be used by Tenant to cover costs incurred by
> Tenant in connection with preparing the Premises for Tenant's initial
> occupancy which do not constitute "hard costs" of constructing the
> Initial Alterations.

(B) Tenant may request disbursements of the Tenant Fund only by giving a Disbursement Request to Landlord. Landlord shall make two (2) disbursements from the Tenant Fund as follows: (I) up to one-half of the Tenant Fund to Tenant (or to such other party as directed by Tenant), upon the completion of 50% of the Initial Alterations (as certified by Tenant's architect) and (ii) any balance of the Tenant Fund due to Tenant upon the later to occur of (x) Substantial Completion of the Initial Alterations (as certified by Tenant's architect), (y) the date Tenant provides Landlord with reasonably sufficient documentation necessary for Landlord to determine the hard construction costs of the Initial Alterations performed in and to Ground Floor Unit #2, and (z) the date Tenant opens the Premises for business to the general public for the Permitted Use, with respect to each Disbursement, each within twenty (20) business days after Landlord's receipt of the applicable Disbursement Request from Tenant; provided, however, that (I) Landlord shall have no obligation to make any such disbursement if, on the date when Tenant gives the Disbursement Request to Landlord, or on the date when Landlord proposes to make such disbursement an Event of Default has occurred and is continuing, (ii) Landlord shall have no obligation to make any such disbursement unless the materials relating thereto have been incorporated into the Premises, or the services relating thereto have been performed, as the case may be, and (iii) the amount of any such disbursement shall not exceed the aggregate amounts theretofore paid or payable to Tenant's contractors, subcontractors and materialmen  which have not been the subject of a previous disbursement from ths Tenant Fund (the amount described in this clause (iii) being referred to herein as the "Maximum Disbursement Amount").

11.   Under Section 3.1(F) of the Lease, the store was to have been fully renovated and ready for opening within 12 months of commencement of construction which itself was to begin within 60 days of executing the Lease:

(F) Tenant shall commence performance of the Initial Alterations by not later than sixty (60) days after the Commencement Date, shall

thereafter diligently continuously prosecute the same to completion, and shall substantially complete the Initial Alterations, and cause the Premises to be open to the public for the conduct of business as a fully operating Treehaus establishment in accordance with the provisions of Article 2 hereof, by not later than one-year anniversary of the Commencement Date. The Initial Alterations shall include, without limitation, the construction and installation of a first-class restaurant comparable to the "Treehaus" located at 830 Third Avenue, New York, New York, as operated on the date of this Lease, and in keeping with the upscale image of the Building.

## B. Construction Loan is Obtained from Newbank

12.  Five days after the store Lease was executed, based upon an earlier bank application, on October 28, 2013, Newbank located in Flushing, New York, issued an SBA loan for $2 million based upon plaintiffs' application dated October 17, 2013, or thereabouts.  Newbank issued this loan in its capacity as a "PLP lender" (Preferred Lending Program member of the U.S. Small Business Administration).  The loan closed on or about October 28, 2013, and funds were disbursed to plaintiff 470 West 42 Street Gourmet on that date.  Newbank was responsible for paying the construction loan proceeds to the general contractor based upon progresses made by the contractor in incremental stages of completion.

## C. The General Contractor Fails to Meet Construction Completion

13.  Plaintiff hired Artikulation, Inc., 109 West 27th Street, Suite 11A, New York, New York 10001, as its general contractor for the full scope of construction

and renovation services to render the demised premises fully "turn key" ready for business in under one year.  On October 18, 2013, Artikulation, through its sister entity known as Unspace, Inc., provided plaintiffs with a written estimate that initially called for $2.75 million in estimated construction budget.  After renegotiations, Artikulation brought the proposal down to a reduced total of $1,946,500.00.  The SBA construction loan obtained from Newbank was more than sufficient to cover the total construction cost.  Under a revised, February 25, 2014, agreement, Artikulation agreed to provide a "turn key [construction] project" based upon the floor plans which were then in effect.  Artikulation agreed that the construction project would be completed within "nine months" of commencement, or November 2014 based upon a commencement date of February 2014.

14.  As Newbank had issued a "construction loan," the bank and its officers were in control over the timing of the draw-down of funds, based upon the progress of the construction job and with the incremental milestones.  Newbank represented that it had prescribed, or entered into an understanding, with Artikulation as to the time-line of the construction stages and payment periods to meet various "interim completion stages" leading to the "final completion" stage, for the draw-down. Plaintiff expected that Newbank would disburse the SBA funds in no sooner than quarterly installments based upon the general contractor's achievements, based upon

the one year completion mark proposed by Artikulation.

15.   Plaintiff came to learn some time in late 2014 or early 2015, when construction completion was expected, that Newbank had disbursed all or substantially all of the construction payments to Artikulation without abiding by the construction milestones.  As a result, plaintiff's overall construction project had been suffering "delays" that were fully preventable and the project was now more than six months behind schedule, and eventually became two full years beyond schedule, as the Grand Opening was delayed until December 2016, because Newbank failed to manage the draw-down properly.

16.   The period from late 2014 through late 2016, for two full years, was punishing and disastrous for plaintiff.  With the entire $2 million construction loan already "depleted" and funded, without completion, the general contractor now claimed that "further payments" were required and looked to plaintiff to "cover" an increasing "short fall."   With no revenue stream, plaintiff had to cover "rent" payments and other operational expenses and arrearage.  Due to Newbank's failure to properly manage the construction-and-payment time line and conditions, plaintiff was placed under a serious economic duress relating to the non-completion of the construction project even after $2 million plus had been spent; the loss of matching tenant credits benefits under the Lease; and the impending breach of the Lease due

8

to delays in rent payments caused by the lack of revenue from the lack of a Grand

Opening; and the palpable disaster of the business not launching at all.

### D. Funds are Raised from the Sale of 830 Third Avenue Gourmet

17.   With little alternatives, and under severe financial distress, Michael Park

sold another substantial deli/café operation he owned and operated, generally known

as 830 Third Avenue Gourmet Inc., then located at 830 Third Avenue, New York,

New York and used a portion of the proceeds of the sale of that business to cover

construction costs.

18.   Despite the efforts of plaintiff and its principal Michael Park, due to "cost

overruns" claimed by the general contractor which could not be met, plaintiff became

unable to immediately obtain the landlord's contribution for the tenant credit and did

not cover the pending alleged "construction modification" related cost, alleged

"overruns," and the "turn key" grand opening that was assured previously was pushed

more and more distant by the general contractor.

### E. Plaintiff Negotiates a Loan from KJY Investment

19.  In the summer of 2015, plaintiff sought third-party funding and negotiated

with a private lender known as KJY Investments, LLC., located in Englewood Cliffs,

New Jersey.  Through KJY Investments, plaintiffs obtained $1.5 million secured by

secondary positions in the lien chain and a pledge of ownership of 30 shares of its

outstanding shares and personal guaranty.  Those $1.5 million funds were used to

cover the alleged construction cost overruns so that the business could be launched.

The funding was to be provided immediately upon the closing, to be held in

plaintiff's account, and draw-down of funds was to be done in accordance with the

construction completion schedule.

20. The negotiated consideration of the KJY loan were that plaintiff would

obtain a two year balloon loan at 1.15% per month, or 13.80% per annum, with

interest payments only, along with significant costs for origination and other matters.

As collateral, the loan agreement contemplated the following extensive list of items:

> 5.   COLLATERAL.
>       The Loan shall be secured by the collateral listed below:
>
> A.   Second UCC lien against the Corporation in the amount of $1,500,000.00;
> B.   Guaranty of Payment by Michael Park and Ryunghee Cho;
> C.   Security interests in all personal and fixture property of every kind and  nature, including all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents and accounts, as more fully set forth in the Security Agreements executed by Borrower.
> D.   Pledge of all equitable shares of the Borrower owned by Michael Park.
> E.   Second mortgage on Ryunghee Cho's property located at 30 regency Place, Unit 30, Weehawken, NJ (Block: 45.1, Lot 4.01-00030).
>
> F.   Confessions of Judgment which the Lender agrees not to record unless there is a default in the agreement or any underlying

documents executed simultaneously herewith.

21.  In addition to plaintiff's own instruments, defendant KJY also requested the general contractor's performance guaranty for the completion of the alleged "incomplete" construction matters that triggered the alleged "cost overruns," and Artikulation is believed to have agreed to such guaranty both individually and corporately.

22. In October 2015, the KJY loan closed.  Numerous legal instruments were presented to plaintiff and plaintiff's principal, Michael Park, signed as requested on each document presented without an opportunity to review accuracy of the contents of those documents expecting them to be consistent with the antecedent negotiations concerning the loan.

23.  At the time of the loan, defendants knew full well that plaintiff was having cash-flow difficulties due to the total failure to have any cash flow and that such cash flow difficulties would continue until and unless the supermarket's Grand Opening was achieved, which was necessarily dependent upon the completion of construction by the general contractor who was now under defendants' control linked to the draw-down authorizations.

### F. Defendants Breach The Loan Agreement Immediately

24. Despite the requirement to fund the $1.5 million loan immediately, defendant failed to do so. Instead, defendant itself did not have adequate capital or intentionally delayed funding the loan as required and did so only incrementally. The loan was funded by defendant in piecemeal fashion over a period of several allocations which did not constitute a single lump sum funding with which plaintiff could control the construction milestones remaining on the project for the earliest possible completion tied to the funding.

25. Despite the fact that the defendant was to secure the timely completion of the construction, and obtained both personal and corporate performance guaranties from the general contractor, Artikulation, defendant totally failed to secure the required completion compliance and released the payments to the general contractor without properly securing the completion. Defendant reneged on its duties while it passed all of the blame upon the plaintiff when, in fact, defendant was exerting control over the construction process.

### G. Defendants Engage in Tortious Acts

26. One specific item of signed document that plaintiff and its principal were unaware was that a certain "Shareholder Agreement" signed by Michael Park actually claimed to have "vested" ownership interest in favor of KJY immediately at the time

of closing, rather than operating as a security for the loan.  According to defendant's

principal Young Man Kim, after the loan closed, when he began to visit the

supermarket location in late 2016 and early 2017, defendant was "part owner" of

plaintiff.  Defendant not only claimed to be "part owner" and an actual "shareholder,"

rather than a contingent, conditional shareholder, in the event of a default, but also

claimed specifically that it owned "30% of the business" which was not agreed by

plaintiff or its principal Michael Park when the 30 shares or pledge was negotiated.

27.  At most, 30 shares among 200 outstanding shares amounts to 15% of the

corporate stock interest and this was pledged in the event of a default and

enforcement.  As of last 2016, the defendants have been behaving as though the

conditional pledge and loan agreement do not mean what they were negotiated to be,

and that defendant Youngman Kim is the "owner" of plaintiff's business.

28. The current situation, as asserted by defendants, amounts to a commercial

lender of a two-year supplemental construction loan claiming to be a "shareholder"

in the borrower's business and, in the alleged exercise of alleged shareholder rights,

the lender has been actively interfering with the conduct of the day to day business.

The lender has been coercing the borrower to sue the borrower's landlord despite the

fact that the borrower has a good relationship with the landlord.  The lender has been

coercing the borrower to sue another lender, with a superior lien position as against

the lender to cause the first lien position to be waived or negotiated down. The lender has been interfering with the day to day conduct of the business at the store location, attempting to direct employees as to how to conduct themselves and "instructing" plaintiff as to where to position products, and routinely threatening that the lender could easily "wipe out" plaintiff's managerial interest in the business.

## CLAIMS FOR RELIEF

## AS AND FOR A FIRST CLAIM

## (Declaratory Judgment)

29. Plaintiff incorporates the preceding allegations by reference.

30. Plaintiff seeks a declaratory judgment against the defendants or each of them. Plaintiff seeks declaratory judgment in the following respects:

      A. First, defendants' failure to properly fund the $1.5 million loan constituted a breach of the loan agreement.

      B. Second, defendant's failure to secure proper, timely completion of the construction, with failure to handle draw-down to secure compliance, constituted a breach of the loan agreement.

## AS AND FOR A SECOND CLAIM

## (Declaratory Judgment)

31. Plaintiff incorporates the preceding allegations by reference.

32.  Plaintiff seeks a declaratory judgment against the defendants or each of them.  Plaintiff seeks declaratory judgment in the following respects:

A.   Defendant does not possess any actual, vested ownership or shareholder interest in the plaintiff company.

B.  Defendants possess no legal basis to assert their force in the day to day operation of the business, and any interference.

## AS AND FOR A THIRD CLAIM

### Breach of Agreement

33. Plaintiff incorporates the preceding allegations by reference.

34. Defendant KJY has breached its agreements with plaintiff in the following respects:

A.  First, defendants' failure to properly fund the $1.5 million loan constituted a breach of the loan agreement.

B.  Second, defendant's failure to secure proper, timely completion of the construction, with failure to handle draw-down to secure compliance, constituted a breach of the loan agreement.

C. Third, defendant's acts of interference in the day to day operation of the business including its coercion that plaintiff file suit against its landlord, suit against its lender having superior lien position, Newbank, and other matters of

plaintiff's business judgment constituted a breach of the loan agreement.

35. Plaintiff has suffered catastrophic financial losses due to defendants' acts and omissions and defendants' antecedent breach.

## AS AND FOR A FOURTH CLAIM

### Breach of The Covenant of Good Faith and Fair Dealing

36. Plaintiff incorporates the preceding allegations by reference.

37. By reason of the foregoing, defendants and each of them breached the covenant of good faith and fair dealing which is implied in every contract by law.

38. Plaintiff suffered significant losses due to defendants' acts and omissions and defendants' antecedent breach.

## AS AND FOR A FIFTH CLAIM

### Promissory Estoppel

39. Plaintiff incorporates the preceding allegations by reference.

40. Plaintiff reasonably and foreseeably relied upon the statements made to them by defendants (A) proper funding of the loan sum in a single sum; (B) to their "control and supervision" of the construction process; providing the draw-down payment to the general contractor to be completed along with the construction completion and ( C ) the pledged 30 shares being used for security.

41. As a result of defendants' unilateral draw-down payment to the general

contractor before completion of the construction project and as a result of the unilateral extortionate addition of further terms and conditions, Plaintiffs suffered from defendants' wrongful acts, without a legal basis.  By those acts and omissions, Plaintiffs have been injured, and continue to be injured.

## AS AND FOR A SIXTH CLAIM

### Tortious Interference With Contract

42.  Plaintiff incorporates the preceding allegations by reference.

43.  A valid contractual agreement between plaintiff and its landlord exists. Defendants had knowledge of this agreement.   Defendants have interfered with the agreement and each of them has been attempting to cause plaintiff to be held in breach of the lease by the landlord and vice-versa so as to garner a perceived financial advantage from their second-lien lender position.  Defendants' interference has been intentional and improper.

44. By reason of defendants' actions and contractual interference, Plaintiff has been suffering injury.

## AS AND FOR A SEVENTH CLAIM

### Fraud in the Inducement

45. Plaintiff incorporates the preceding allegations by reference.

46.  Defendants, as lenders, failed to disclose at the outset that they were

seeking, planning, and intending to become a shareholder. Defendants held themselves out to be lenders. Defendants held themselves out to be lenders who were going to acquire a secondary lien position, next in line to Newbank's superior lien position, but in fact intended to prejudge Newbank's position by asserting alleged "rights" that did not exist, including the right to assert claims against Newbank; the "right" to override Newbank's superior lien position; and other matters.

47. Defendants represented that the stock pledge was to be used in case of default. The relevant period of "default" was after cash flow began, since defendants knew full well that plaintiff had no cash flow until the construction was completed and the store Grand Opening was achieved. Thus, defendants knew that the likely period of plaintiff's commencement of payments would be after the store's Grand Opening, when sufficient cash flow was generated to make payments.

48. Despite their antecedent knowledge, despite their control over the construction process which could have been fully managed to be accomplished in a timely fashion, despite their failure to properly fund the loan, having failed to perform their duties and responsibilities, defendants have been declaring that plaintiff has been in "breach" since the second month of the loan's partial funding.

49. By reason of defendants' actions and wrongful interference, Plaintiff has been damaged.

## AS AND FOR AN EIGHTH CLAIM

### Breach of Fiduciary Duty

50. Plaintiff incorporates the preceding allegations by reference.

51. By assuming roles far beyond that of a normal and customary lender qua lender, and by assuming the duty and responsibility over certain acts, defendants became a fiduciary to plaintiff. Specifically defendants became fiduciaries in connection with the completion of the construction in a timely fashion and failed to meet their duty. They have thus breached their fiduciary duty. Defendants breached their fiduciary duty deliberately and strategically so as to acquire an "ownership" interest in plaintiff's business and ultimately to exert full control over the operation of the business.

52. By reason of defendants' acts and omissions, plaintiff has been damaged and continues to be damaged.

WHEREFORE, the Plaintiff demands judgment:

      A. appropriate declaratory judgment;

      B. compensatory damages;

      C. punitive damages;

      D. permanent injunction;

      E. fees and costs; and

F.  such other and further relief as the Court deems fair and just under the circumstances.


Dated: February 28, 2017                    Respectfully,

                                            /s/ Michael S. Kimm

                                            Michael S. Kimm, Esq.
                                            Adam Garcia, Esq.
                                            KIMM LAW FIRM
                                            333 Sylvan Avenue, Suite 106
                                            Englewood Cliffs, New Jersey 07632
                                            T: 201-569-2880
                                            *Attorneys for Plaintiff*